ACCEPTED
01-14-00886-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
6/23/2015 2:14:34 PM
CHRISTOPHER PRINE
CLERK

No. 01-14-00886-CR

In the
Court of Appeals for the First District of Texas
At Houston

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
6/23/2015 2:14:34 PM
CHRISTOPHER A. PRINE
Clerk

Cause No. 1389543
In the 248th District Court
Of Harris County, Texas

ANA MARIA GONZALEZ-ANGULO
*Appellant*

v.

THE STATE OF TEXAS
*Appellee*

APPELLANT'S BRIEF

Barbara A. Drumheller
8501 Katy Fwy, Ste 201
Houston, Texas  77024
713-504-4492
Texas Bar No. 00793643

ORAL ARGUMENT REQUESTED

## IDENTITY OF PARTIES AND COUNSEL

Appellant:  Ana Maria Gonzalez-Angulo

Counsel for Appellant at Trial:
        Derek Hollingsworth
        Texas Bar No. 24002305
        Andy Drumheller
        Texas Bar No. 00793642
        Rusty Hardin & Associates
        1402 McKinney, Suite 2250
        Houston, Texas 77010
        713-652-9000

        John William Belk
        Texas Bar No. 24038763
        John William Belk & Associates
        5 Houston Center
        1401 McKinney, Suite 2250
        Houston, Texas 77010
        713-652-9044

Counsel for Appellant on Appeal:
        Barbara A. Drumheller
        650 West Bough Lane, Ste 150-130
        Houston, Texas  77024
        713-504-4492
        Texas Bar No. 00793643

Counsel for the State at Trial:
        Justin Keiter
        Texas Bar No. 24044225
        Nathan Hennigan
        Texas Bar No. 24058612
        Eric Kugler
        Texas Bar No. 00796910
        Assistant District Attorneys
        1201 Franklin
        Houston, Texas 77002
        713-755-5800

Trial Judge:  The Honorable Katherine Cabaniss

## TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL............................................. 2

TABLE OF CONTENTS .......................................................... 3

INDEX OF AUTHORITIES ...................................................... 5

STATEMENT OF THE CASE ................................................... 8

ISSUE PRESENTED ................................................................ 9

The trial court erred by denying Ana Maria Gonzalez-Angulo's motion for new trial based on newly discovered evidence.

The evidence presented at trial was insufficient to sustain a conviction for aggravated assault because the State was unable to connect Ana Maria Gonzalez-Angulo with the injuries sustained by the complainant.

The State failed to establish Ana Maria Gonzalez-Angulo was "in a dating relationship" under the terms of the Family Code and the Penal Code and the evidence was insufficient to support the offense as pled in the indictment.

The trial court erred by allowing a State's witness to identify Ana Maria Gonzalez-Angulo's voice in a surreptitiously recorded telephone call based on two prior anonymous telephone conversations during which the State's witness never learned the identity of the person with whom he was talking.

3

SUMMARY OF THE ARGUMENT......................................................... 10

APPELLANT'S POINT OF ERROR ....................................................... 47

PRAYER ............................................................................................. 62

CERTIFICATE OF SERVICE............................................................... 63

# INDEX OF AUTHORITIES

**Cases**

*Barley v. State*, 906 S.W.2d 27 (Tex. Crim. App. 1995) ....................... 21, 26

*Billodeau v. State*, 277 S.W.3d 34 (Tex. Crim. App. 2009). ....................... 29

*Bowen v. State*, 374 S.W.3d 427 (Tex. Crim. App. 2012); ......................... 57

*Boyett v. State*, 692 S.W.2d 512 (Tex. Crim. App. 1985) ........................... 35

*Cada v. State*, 334 S.W.3d 776 (Tex. Crim. App. 2011). ........................... 42

*Carsner v. State*, 444 S.W.3d 1 (Tex. Crim. App. 2014) ............................ 34

*Clayton v. State*, 235 S.W.3d 772 (Tex. Crim. App. 2007). ....................... 44

*Coyler v. State*, 428 S.W.3d 117 (Tex. Crim. App. 2014) ........................... 35

*Dispensa v. Lynaugh*, 847 F.2d 211 (5th Cir. 1988) .................................. 27

*Gamboa v. State*, 296 S.W.3d 574 (Tex. Crim. App. 2009) ......................... 21

*Garcia v. State*, 367 S.W.3d 687 (Tex. Crim. App. 2012). .......................... 44

*Garza v. State*, 633 S.W.2d 508 (Tex. Crim. App. [Panel Op.] 1981) ......... 24

*Giglioblanco v. State*, 201 S.W.3d 637 (Tex. Crim. App. 2006). ................ 30

*Hacker v. State*, 389 S.W.3d 860 (Tex. Crim. App. 2013). ......................... 46

*Hobbs v. State*, 298 S.W.3d 193 (Tex. Crim. App. 2009). .......................... 33

*Hooper v. State*, 214 S.W.3d 9 (Tex. Crim. App. 2007) ............................. 44

*Ibarra v. State*, 11 S.W.3d 189 (Tex. Crim. App. 1999). ............................ 21

*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ...................................................................... 42

*Keeter v. State*, 74 S.W.3d 31 (Tex. Crim. App. 2002). ............................. 34

*Loserth v. State*, 963 S.W.2d 770 (Tex. Crim. App. 1998) ........................ 21

*Madden v. State*, 799 S.W.3d 683 (Tex. Crim. App. 1990)........................ 23

*Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). ......... 26

*Odelugo v. State*, 443 S.W.3d 131 (Tex. Crim. App. 2014); ...................... 35

*Richard Winfrey v. State*, 323 S.W.3d 875 (Tex. Crim. App. 2010). ......... 44

*Riley v. State*, 378 S.W.3d 453 (Tex. Crim. App. 2012).............................. 34

*Routier v. State*, 273 S.W.3d 241 (Tex. Crim. App. 2008),........................ 48

*Sanchez v. State*, ---S.W.3d--- (Tex. App.—Eastland, 2015)...................... 53

*Sierra v. State*, 266 S.W.3d 72 (Tex. App.—Houston [1st Dist.] 2008, pet ref'd)................................................................................................. 26

*Stobaugh v. State*, 421 S.W.3d 787 (Tex. App.—Forth Worth 2014, no pet.). ...................................................................................... 49, 50

*Stokes v. State*, 277 S.W.3d 20 (Tex. Crim. App. 2009). ........................... 33

*Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967);.. 23

*Temple v. State*, 390 S.W.3d 341 (Tex. Crim. App. 2013).................... 46, 48

*Thornton v. State*, 425 S.W.3d 289 (Tex. Crim. App. 2014). .................... 57

*United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). ................................................................................................. 23

*Villareal v. State*, 286 S.W.3d 321 (Tex. Crim. App. 2009)........................ 53

*Wallace v. State*, 106 S.W.3d 103 (Tex. Crim. App. 2003);........................ 34

**Statutes**

TEX. CODE CRIM P. ANN. art 42.12 sec. 4(d) ................................................. 14

TEX. CODE CRIM. P. ANN. art. 42.12 sec 4 ..................................................... 11

TEX. CRIM. P. ANN. art. 37.01 (Vernon 2010). ................................................ 9

TEX. CRIM. P. ANN. art. 37.04 (Vernon 2010) ................................................. 9

Tex. Pen. Code Ann. sec. 12.33(a) ................................................................ 11

TEX. PENAL CODE 12.33 ................................................................................. 14

**Rules**

Tex. R. App. P. 21.3(f) ................................................................................. 15

Tex. R. App. P. 43.2(b ................................................................................. 17

7

## STATEMENT OF THE CASE

Ana Maria Gonzalez-Angulo was charged by indictment with the felony offense of aggravated assault, dating relationship (C.R. 23). In particular, she was charged with unlawfully, intentionally and knowingly causing serious bodily injury to a person with whom she had a dating relationship by poisoning the complainant with ethylene glycol, a deadly weapon (C.R. 23). The indictment included an alternative charge alleging she unlawfully, intentionally and knowingly caused serious bodily injury to a person with whom she had a dating relationship by causing the complainant to ingest ethylene glycol, a deadly weapon (C.R. 23). The appellant pled not guilty and the case was tried before a jury (R.R.5 – 18). The jury found appellant guilty as charged in the indictment (C.R. 156). Thereafter, the jury assessed punishment at confinement for ten years in the Institutional Division of the Texas Department of Criminal Justice and also assessed a $10,000 fine (C.R. 156). Motion for new trial was timely filed on October 29, 2014 and notice of appeal was timely filed.

## ISSUES PRESENTED

The trial court erred by denying Ana Maria Gonzalez-Angulo's motion for new trial based on newly discovered evidence.

The evidence presented at trial was insufficient to sustain a conviction for aggravated assault because the State was unable to connect Ana Maria Gonzalez-Angulo with the injuries sustained by the complainant.

The State failed to establish Ana Maria Gonzalez-Angulo was "in a dating relationship" under the terms of the Family Code and the Penal Code and the evidence was insufficient to support the offense as pled in the indictment.

The trial court erred by allowing a State's witness to identify Ana Maria Gonzalez-Angulo's voice in a surreptitiously recorded telephone call based on two prior anonymous telephone conversations during which the State's witness never learned the identity of the person with whom he was talking.

## SUMMARY OF THE ARGUMENT

The trial court erred in overruling the appellant's motion for new trial based on newly discovered evidence. If a defendant discovers new evidence within thirty days of the verdict and the four-part test is met, the granting of a new trial is not discretionary. In this case, Mary Kara Bucci's testimony was newly discovered evidence and it satisfied all four prongs of the test so Ana Maria Gonzalez-Angulo should have been granted a new trial.

The evidence in this case was insufficient to prove the elements of aggravated assault. Circumstantial evidence is treated exactly like direct evidence in a sufficiency review and can even be more probative than direct evidence in some situations. It must not amount to mere suspicion or a catalogue of bizarre behaviors, however, and the cumulative effect of all the incriminating facts must be sufficient to prove every element of the offense. The State was unable to connect the appellant to any wrongdoing and was not even able to prove the complainant was harmed by another person. At most, the State presented a case based on opportunity and suspicious behaviors that were unrelated to the actual injuries in the case.

The evidence wholly failed to establish a dating relationship between the appellant and the complainant. None of the witnesses at trial, including the complainant and the appellant, considered the relationship to be a dating relationship. There was no evidence to contradict the complainant's explicit testimony that they were friends and colleagues and not involved in a dating relationship.

The rules of evidence provide authentication and identification procedures for identifying voices prior to admitting audio recordings into evidence. In this case, the State sought to do the opposite of what the rules anticipate. The State elicited testimony from an investigating witness about an anonymous caller. The witness spoke to the anonymous caller more than a year before trial. The State tried to get the witness to identify the anonymous caller as the appellant in this case by asking him to listen to a recording of her voice and decide whether or not the person in the recording was the same person he had spoken to anonymously over a cell phone more than a year before. This testimony was harmful to the appellant because there was a substantial risk of misidentification and it allowed the State to give the jury the impression that she was the anonymous caller.

## STATEMENT OF APPLICABLE FACTS

Ana Maria Gonzalez-Angulo worked closely with the complainant, Dr. George Blumenschein, at the M.D. Anderson Cancer Center (R.R.9 – 157-158). The two doctors collaborated on cancer research over a period of several years (R.R.9 – 157-158). The complainant had a relationship with Dr. Evette Toney, a former M.D. Anderson employee, who was variously described by witnesses at trial as his common-law wife (R.R.5 – 176, 7 - 218), his "long-term girlfriend" (R.R.5 – 95), his "on-again, off-again girlfriend" (MNT Bucci Affidavit) and his "live-in girlfriend". The complainant characterized his relationship with Evette Toney as a committed, serious relationship in which they were "taking the next step," (R.R.9 – 215) a relationship spanning approximately sixteen years at the time of trial, but also described himself as a bachelor who feared commitment (R.R.9 – 216).

While he was living with Evette Toney in what she believed to be a monogamous relationship, the complainant began a casual sexual relationship with Ana Maria Gonzalez-Angulo sometime around the spring or summer of 2011 (R.R.9 – 161). Both parties referred to this development as "just sex" inside a relationship that was ninety-five percent or more based

on work and research collaboration (R.R.10 – 48; R.R.11 – 85-87). The complainant had engaged in these kinds of purely sexual, casual work arrangements with other colleagues in the past (MNT Bucci Affidavit, Belk Affidavit), and made a distinction between what he considered "real" or romantic sex – intercourse – and the oral sex he enjoyed as part of his work affairs (R.R.9 – 167-168). When colleagues questioned the complainant about his private life or his affairs with women at work, he lied and said there was nothing sexual involved (R.R.9 – 173, 10 - 69). In particular, the complainant's supervisor, Bonnie Glisson, thought the complainant's attentions to Ana Maria Gonzalez were "unseemly," but when she asked him about her suspicions and about the rumors going on in the office that there was a sexual relationship between them, the complainant adamantly denied it (R.R.10 – 90, R.R.7 – 104).

The complainant traveled frequently for work and his extracurricular sexual activities often took place during these trips (MNT Bucci Affidavit, R.R.12 – 10, 12, 13, R.R.10 – 42, 45). The complainant had arrived home from one of these trips on Saturday, January 26, 2013 (R.R.9 – 48-52, 240-242).

On the morning of January 27, 2013, a Sunday, the complainant had coffee at home but said he didn't want to eat (R.R.6 – 64-65). He told Evette

Toney he was going to work but drove over to Ana Maria Gonzalez-Angulo's house instead (R.R.9 – 250). At her house, according to the complainant, he drank a sip of coffee and shared some cheese bread with her (R.R.9 – 251). The complainant told investigators and others, including the grand jury, that Ana Maria Gonzalez-Angulo drank the same coffee with him out of the same cup (R.R.10 – 65, 67). Evette Toney confirmed during direct and cross-examination that the complainant liked to share her beverages and that they frequently drank out of the same cup or glass. She said, "That's just the way he is." (R.R.11 – 21-22, 163-164). After breakfast, the complainant, a man twice the size of Ana Maria Gonzalez-Angulo, picked her up and carried her upstairs where they engaged in oral sex (R.R.10 – 74). They shared a shot of vodka out of a sealed, unopened bottle and went to the office (R.R.10 75-76, R.R.9 – 253-254).

The complainant and Ana Maria Gonzalez-Angulo worked in the offices of M.D. Anderson for much of the morning and afternoon. In the late afternoon, the complainant began complaining of dizziness and may have been slurring his words, although some of his colleagues at M.D. Anderson maintained he was acting "tired, but normal." (R.R.9 – 267, R.R.6 – 160, 170, 180-181). The complainant testified that Ana Maria Gonzalez-Angulo suggested he might be experiencing low blood sugar, and invited him to her

14

home for some cheese and sausage (R.R.9 – 268, 270, 272). At her home, the complainant cut his thumb while trying to cut the sausage (R.R.9 – 273). The cut bled enough that the two doctors discussed going to the emergency room. Ultimately they decided to call a third doctor and close friend, an M.D. Anderson cancer surgeon, to bandage his cut (R.R.9 – 273, R.R.5 – 79-80). Dr. Funda Meric-Bernstram testified at trial that Ana Maria Gonzalez-Angulo was concerned about the complainant's cut and his behavior, which seemed unusual (R.R.5 – 80-88). Dr. Meric-Bernstram conducted some brief neurological tests and advised them to go to the hospital. The complainant did not wish to go to the hospital and insisted he would be fine (R.R.5 – 88). The complainant and Ana Maria Gonzalez-Angulo had an important work dinner that evening with a senior staff member at M.D. Anderson. This doctor, Doctor Hwu, had invited Ana Maria Gonzalez-Angulo to dinner to discuss a potential career opportunity with her, and she suggested he include the complainant and another colleague, Cathy Eng (R.R.5 – 185, 210-215, R.R.5 – 239-341).

During dinner, the complainant continued to show signs of what appeared to be intoxication, dropping his phone several times, slurring his words, and knocking his head against a ledge behind the table (R.R.5 – 186-187). Ana Maria Gonzalez-Angulo agreed with Drs. Hwu and Eng that the

complainant should go to the hospital, but could not convince the complainant to do so (R.R.5 – 191-192). She texted Dr. Eng that the complainant was refusing to go to the E.R (R.R.5 – 194). At least one witness described Ana Maria Gonzalez as "frantic" about being unable to convince the complainant to go to the hospital.

The complainant accompanied Ana Maria Gonzalez-Angulo to her home after the work meeting because he was adamant about getting his car (R.R.9 – 279), as he had lied to Evette Toney that morning about where he was going. Ana Maria Gonzalez was worried about letting him drive but he got his keys from her (R.R.11 – 46). He agreed to drive to M.D. Anderson while she followed him (R.R.11 – 46). Evette Toney had been in touch with the complainant and Ana Maria Gonzalez off and on throughout the afternoon and also called Ana Maria Gonzalez about the complainant's health (R.R.11 – 40-47, 180-185). In one text, she asked the complainant, "why are you doing this? You need to get your levels checked. Please come home." (R.R.11 – 184). She met the complainant and Ana Maria Gonzalez at the hospital. She testified she was near tears out of concern for the complainant and believed he was dying based only on his intoxicated behavior (R.R.11 – 48-50). She began videotaping him, not for purposes of evidence collection, but just to record how bad he looked. The videotape

was in evidence and shows the complainant talking to the treating nurse in a friendly, flirtatious manner. By all accounts, the complainant walked into the emergency room under his own power.

Many doctors and nurses, all colleagues and co-workers, cared for the complainant at M.D. Anderson. Both Ana Maria Gonzalez and a nurse in the ICU noticed the whitish sediment in the complainant's Foley urine bag, suggesting the presence of crystals (R.R.5 – 161, 279, 296). The complainant was already beginning to show other signs of kidney damage (R.R.5 – 268). Dr. Lahoti, a nephrologist, began to suspect ethylene glycol ingestion because of the constellation of symptoms: signs of intoxication, metabolic acidosis as shown by his bloodwork, high levels of creatinine indicating kidney failure, and the shape and appearance of crystals visible in his urine as sediment and confirmed microscopically to be the unique shape associated with calcium oxalate (R.R5 – 269-280). Blood tests for ethylene glycol came back negative and no physical evidence or residue of ethylene glycol was presented at trial (R.R.5 – 300). No evidence was found during the investigation indicating the complainant ingested ethylene glycol or encountered it in the days prior to his hospitalization outside of the symptoms he experienced. One of the State's experts, a leading toxicologist specializing in toxic alcohols like ethylene glycol, testified he was "very

surprised there was no ethylene glycol in the complainant's blood result."
(R.R.8 – 166). Nevertheless, through a process of elimination several experts, including Dr. Lahoti, arrived at a confident conviction that the complainant had ingested ethylene glycol. Ethylene glycol is a common solvent used at M.D. Anderson, as well as in the outside world in the form of antifreeze, and virtually everyone has access to ethylene glycol (R.R.5 – 272 and other).

In the days immediately following his hospitalization, the complainant admitted to Evette Toney he had cheated on her with Ana Maria Gonzalez (R.R.11 – 78-79). According to Evette Toney, he also suggested that Ana Maria Gonzalez poisoned him with coffee that morning at her house, but urged her not to divulge the information to anyone (R.R.11 – 73-76, 77). According to Evette Toney, the complainant said, "let's keep this just between ourselves. Let's not tell anybody about this. Let's not poke the dragon." (R.R.11 – 76-77, 205) Evette Toney told investigators that "maybe it was some psycho waiter" who gave the complainant ethylene glycol (R.R.11 – 77).

Evette Toney continued to text and communicate with Ana Maria Gonzalez, however, and even had a conversation with her about her sexual relationship with the complainant. Ana Maria Gonzalez told her, "it's just

18

sex," and told her "he used you and he used me." (R.R.11 – 79-86, 205-208). Ana Maria Gonzalez assisted Evette Toney with getting Family Medical Leave during the complainant's hospitalization and kept her updated and informed about the complainant's condition (R.R.11 – 208).

The complainant told investigators he drank coffee with Ana Maria Gonzalez in the same cup throughout the day and, although he mentioned he did not like the taste of the coffee, he explained Ana Maria Gonzalez sweetened it with Splenda (R.R.10 – 65, 67, 61-62). At trial, more than a year later, he claimed the coffee was sickeningly sweet and he drank it to be polite even though he could barely stand the taste of it (R.R.9 – 258-259). He also claimed he participated in occasional sexual acts with Ana Maria Gonzalez because she flirted with him and he didn't know what to do and didn't want to offend her (R.R.9 – 162). The complainant had had a similar arrangement with another younger female colleague in the past, however, and she testified by affidavit that the complainant was flirtatious and he was the aggressor in the relationship (MNT Bucci Affidavit).

Ana Maria Gonzalez got wind of the complainant's suppositions or accusations and cried in Jennifer Litton's office about the complainant's fixation on the coffee she had sweetened with Splenda (R.R.12- 70-71). She pointed out that she, like almost everyone at M.D. Anderson, had easy

access to ethylene glycol in her laboratory, and expressed to at least one witness that she feared she might be blamed or suspected because of the private and secret nature of her relationship with the complainant. She voiced her concerns to several friends and colleagues about the possibility the complainant had ingested ethylene glycol, contemporaneously with Dr. Lahoti's investigation going in the same direction (R.R.5 – 148, 160-161, R.R.6 – 163, R.R.7 – 116, R.R.12 – 69). She also voiced her opinion that the complainant did not seem like the kind of person who would commit suicide (R.R.6 – 163). Ana Maria Gonzalez suggested to several people that Evette Toney might be responsible or involved in the complainant's ingestion of ethylene glycol. She referred to an incident in December when she'd been attacked at her home and gone with the complainant to the neighborhood police station where she had made a report (R.R.7 – 70-92, R.R.5 – 92). The people behind the attack were never identified but Ana Maria Gonzalez expressed fears that Evette Toney's family might have been involved in it (R.R.5 – 90-91).

The complainant and Evette Toney decided to secretly tape record telephone conversations with Ana Maria Gonzalez. They recorded close to fifteen hours of telephone conversations, all initiated by the complainant, over many weeks before her arrest (R.R.10 – 106-109). The complainant

never asked her whether she poisoned him with ethylene glycol or whether she did something to his coffee on the morning of his hospitalization, and changed the subject when she brought up another occasion when he had had similar symptoms (R.R.10 – 106-110). Evette Toney and the complainant decided not to mention their secret investigation to the police or to the grand jury and did not disclose the tapes of the telephone conversations to the State until immediately before trial (R.R.10 – 106-110). The complainant and Evette Toney also testified they received an anonymous threatening letter the previous November, but no letter was found or produced at trial.

## APPELLANT'S FIRST POINT OF ERROR

The trial court erred by denying Ana Maria Gonzalez-Angulo's motion for new trial based on newly discovered evidence.

Applicable Facts

After the verdict but before time had expired for filing a motion for new trial, a witness contacted defense counsel claiming she had pertinent information she did not disclose prior to trial (MNT). The witness provided an affidavit affirming that she was not forthcoming with the defense investigation prior to trial because she did not want her personal information disclosed in court proceedings or the news media (MNT, Bucci Affidavit).

21

The witness provided testimony that rebutted the State's "fatal attraction" theory of the case. She also provided information that showed the State and the State's witnesses left the jury with a false impression regarding the complainant's behavior toward female colleagues in the workplace, the state of his relationship with Evette Toney, and the degree to which Evette Toney demonstrated jealousy and possessiveness in their relationship. The trial judge held a hearing by affidavit on the motion for new trial and denied the motion, expressly stating on the record that she had reviewed the affidavits submitted by both the State and the defense. The appellant must satisfy the procedural requirements that the motion was timely filed and actually presented to the trial court within ten days' of the motion's filing date. Tex. R. App. P. 21.6; *Stokes v. State*, 277 S.W.3d 20, 21 (Tex. Crim. App. 2009). Once these requirements are met, the defendant has a right to a hearing if the motion (1) raises matters that are not determinable from the record and (2) establishes reasonable grounds upon which the defendant could be entitled to a new trial. *Hobbs v. State*, 298 S.W.3d 193, 199 (Tex. Crim. App. 2009). These requirements were met in the instant case.

Standard of Review

The Code of Criminal Procedure mandates "a new trial *shall* be granted an accused where material evidence favorable to the accused has been discovered since trial." Tex. Code Crim. P. Ann. art. 40.001 (West 2014) (emphasis added). A ruling on a motion for new trial is reviewed under an abuse of discretion standard. **Keeter v. State**, 74 S.W.3d 31, 37 (Tex. Crim. App. 2002). The decision should be reversed if the trial judge's opinion was clearly erroneous and arbitrary. **Riley v. State**, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012).

Arguments and Authorities

In order for a defendant to be entitled to a new trial on the basis of newly discovered evidence, a four-prong test must be satisfied: (1) the newly discovered evidence was unknown or unavailable to the defendant at the time of trial; (2) the defendant's failure to discover or obtain the new evidence was not due to the defendant's lack of due diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in a new trial. **Wallace v. State**, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003); **Carsner v. State**, 444 S.W.3d 1, 2-3 (Tex. Crim. App. 2014). The trial court abuses its discretion if the record shows

these four factors are met. **Boyett v. State**, 692 S.W.2d 512, 516 (Tex. Crim. App. 1985). Although the trial judge has discretion to disbelieve testimony, there must be at least one reasonable view of the record that would support the trial court's denial of the motion for new trial, notwithstanding the "uncontroverted" nature of the appellant's evidence. *See* **Odelugo v. State**, 443 S.W.3d 131 (Tex. Crim. App. 2014); *see also*, **Coyler v. State**, 428 S.W.3d 117 (Tex. Crim. App. 2014) (explaining that the trial judge can disbelieve uncontroverted but patently biased evidence, as in the case of an alibi provided by the defendant's mother).

In the instant case, the witness Kara Bucci testified via affidavit that she was contacted prior to trial by the defense and a lawyer "specifically asked if I had had any romantic or intimate involvement with George. I told him we were professional colleagues and friends only. I denied any romantic or intimate involvement because I did not want my personal, private relationship with George scrutinized in court proceedings or through the news media." Affiant John William ("Billy") Belk confirmed he interviewed the witness by telephone prior to trial but the witness was not truthful with him." (MNT, Bucci Affidavit).

The evidence provided by Mary Kara Bucci, including her knowledge about his relationship with Evette Toney and his feelings for Ana Maria

Gonzalez, as well as other facts not known to the appellant, did not initiate with the appellant and could not have been discovered by her or her investigators prior to trial. Both affiants Billy Belk and Mary Kara Bucci affirmed that the defense exercised due diligence in its investigation and the lack of knowledge about Mary Kara Bucci's information was not due to any fault on the part of defense counsel. Thus, the record satisfies the first two prongs of the test.

The third prong concerns whether the newly discovered evidence is admissible and not cumulative, corroborative, collateral or impeaching. Mary Kara Bucci provided several pieces of crucial evidence for the defense in her affidavit. First, she stated that she had a romantic and intimate relationship with the complainant in 2007, while he was in a relationship with Evette Toney, and noticed he had a "spark of interest" in Ana Maria Gonzalez as early as 2007. This evidence contradicted both the complainant's testimony at trial and the characterization of the evidence by the State. It also shows that the complainant admired Ana Maria Gonzalez long before she was aware of any relationship between them, and indicates that the complainant may have targeted her for sexual harassment as early as 2007, unbeknownst to Ana Maria Gonzalez. Second, Mary Kara Bucci affirmed the complainant was very flirtatious and that he pursued her under

circumstances extremely similar to the ones that occurred with Ana Maria Gonzalez. In particular, he abused his position of authority by pursuing her, a younger professional colleague, in order to engage in a casual sexual relationship with her from summer 2006 until January 2010. Just as with Ana Maria Gonzalez, this "relationship" consisted of oral sex at professional conferences and at the home of the female colleague.

At trial, the State and the complainant gave the jury the impression that the complainant was in a stable, happy and monogamous long-term relationship with Evette Toney and that it was Ana Maria Gonzalez who became obsessed and aggressively pursued him (R.R.9 – 162). He left the jury with the false impression that he only had an affair with her because he was too nice to say no (R.R.9 – 162). Had Ana Maria Gonzalez known about his similar relationship with Mary Kara Bucci, she would have been able to show a pattern of relationships he initiated with younger female colleagues for his own benefit. This evidence, in turn, would have refuted the State's implications about motive and opportunity, which were key to its circumstantial case.

Mary Kara Bucci stated that she believed the complainant was unhappy with Evette Toney and did not want to stay in the relationship, that Evette Toney pursued him with repeated phone calls on two phone lines

26

while they were together, and that he was beaten down by her attempts to reach him (MNT, Bucci Affidavit). This evidence fits with evidence given by Sherry Krantz about Evette Toney's jealous and possessive behavior (MNT, Belk Affidavit). Evette Toney testified at trial that she took the complainant's word at face value and believed him when he said he was not having an affair with Ana Maria Gonzalez. The evidence presented in the motion for new trial tells a different side of the story and provides important information bearing on the nature of the relationship between the complainant, Evette Toney, and his various work affairs.

Finally, Mary Kara Bucci stated that in July 2012, when she invited the complainant to speak at a conference, he told her his relationship with Evette was over and indicated that he had romantic feelings for Ana Maria Gonzalez. At trial, the complainant and Evette Toney both testified they were in a committed relationship in July 2012 and, in fact, Evette Toney was pregnant with twins at that time.

The record must establish that the new evidence is probably true and will probably bring a different result in a new trial. Mary Kara Bucci gave specific and telling details in her affidavit with no motivation to lie and at personal risk to her own reputation and privacy. She is a licensed physician living in Palmer, Alaska, who contacted Ana Maria Gonzalez' trial lawyers

on her own initiative to tell the truth about what she knew. She and Ana Maria Gonzalez had never met and were not friends.

The evidence she provided in her affidavit changes the probable outcome of a trial in several respects. First, the similarity of her relationship with the complainant and the doubt it casts on his version of events could persuade the trial court to reconsider its ruling on the State's motion in limine about the complainant's extra-marital affairs. The court granted the State's motion in limine on the basis that the complainant's extra-marital affairs were too remote in time and not relevant to issues in the trial (R.R.5 – 7-12). Mary Kara Bucci, however, was engaged in an affair with the complainant until 2010, and remained close friends with him up to and including the time period covered by testimony in the trial (MNT, Bucci Affidavit, Blumenschein Affidavit). Moreover, her knowledge of his relationship with Evette and his feelings for Ana Maria Gonzalez were relevant and the jury was left with a false impression about these things without her testimony.

Second, the information provided by Mary Kara Bucci indicates that the complainant left a false impression with the jury regarding his feelings for Evette Toney and his intentions about starting a family with her.

Third, the evidence at trial gave the jury a false impression about Evette Toney and her level of possessiveness and jealousy concerning the complainant, as evidenced by Mary Kara Bucci's disclosures about her repeated and frequent phone calls to him when they were together.

Fourth, the information provided by Mary Kara Bucci rebuts the State's characterization of the complainant and Ana Maria Gonzalez in a "fatal attraction" relationship, wherein Ana Maria Gonzalez pursued the complainant. Contrary to this characterization, Mary Kara Bucci recalls the complainant developing an interest in Ana Maria Gonzalez as early as 2007, long before their relationship was anything other than professional. Ana Maria Gonzalez had no way of knowing this fact and could not have known she was targeted by the complainant for sexual harassment without this information. Furthermore, Mary Kara Bucci affirms that the complainant was flirtatious and pursued her to begin a relationship extremely similar to the one he began with Ana Maria Gonzalez, contrary to the State's theory that Ana Maria Gonzalez chased or bullied the complainant into a relationship.

The State provided an affidavit by the complainant purporting to dispute the statements made by the new witness (C.R. 190). A careful read of the complainant's affidavit, however, reveals that not only does it fail to

explicitly refute the sworn testimony of a disinterested witness, it confirms it in crucial respects. For example, the complainant takes issue with Mary Kara Bucci's characterization of their relationship when she says, "we spent time together in a romantic context both at home in Houston as well as when we were out of town on business trips." His response is that they did not schedule "dates," he does not recall having dinner with her alone, they did not schedule "romantic dinners" and they did not plan trips to be together (C.R. 190-192). A careful read of what each witness says, however, shows that Mary Kara Bucci never claimed they planned out-of-town trips to be together or scheduled romantic dinners. Instead, she indicates that they had an intimate relationship when they were out of town together on business and spent time in Houston on an intimate basis. The complainant never explicitly contradicted Mary Kara Bucci's contention that they had an "intermittently romantic or intimate" relationship over three and a half years, beginning in the summer of 2006 (MNT, Bucci Affidavit). Instead, he specifically admitted to a period of sexual involvement with Mary Kara Bucci that fit conveniently within a time he had already established as a period of breakup with Evette Toney (C.R. 190-192). He stated in his affidavit that he believed the sexual aspect of their relationship ended in 2009 but does not state unequivocally that this was the case. Likewise, he

30

stated in his affidavit that he did not recall discussing his relationship with Evette with Mary Kara Bucci, he did not recall an occasion on which Evette made repeated and harassing phone calls to his office while he was with Mary Kara Bucci and he did not remember meeting Ana Maria Gonzalez before 2008. None of these uncertainties contradict the testimony given by Mary Kara Bucci and they have the effect, overall, of confirming the truth of much of her testimony.

Moreover, the complainant expressly admitted to lying extensively about his private life while he was on the stand during trial (R.R.10 – 118-121, R.R.7 – 104). It is patently obvious that Mary Kara Bucci does not stand to benefit from providing her testimony, whereas the complainant's rebuttal is self-serving and supports his interest in protecting his personal reputation and preventing any increased scrutiny into the events presented at trial. The best evidence the State had in this case came from the complainant. To connect Ana Maria Gonzalez with his injuries at all, the jury had to take the complainant's word that she gave him funny tasting coffee on the morning of his hospitalization and continued to give it to him even after he complained about its taste. The complainant demonstrably lied, as he admitted on the stand, to everyone involved in the case, from his live-in girlfriend to his supervisors and colleagues at work to the investigators

working the case. Evidence from a new witness conclusively demonstrating the depth and reach of his lies is exculpatory admissible evidence.

There is no reasonable view of the case which supports the trial court's determination that appellant is not entitled to a new trial despite the newly discovered evidence provided by Mary Kara Bucci. The appellant's motion for new trial meets all four of the ***Keefer*** factors and plainly establishes that she is entitled to a new trial under the Code of Criminal Procedure. While the court has some discretion in evaluating evidence based on credibility, if an appellant can meet the four prongs of the test, the judge *shall* order a new trial. This case should be reversed and remanded for a new trial.

## APPELLANT'S SECOND POINT OF ERROR

> The evidence presented at trial was insufficient to sustain a conviction for aggravated assault because the State was unable to connect Ana Maria Gonzalez-Angulo with the injuries sustained by the complainant.

Standard of Review

On a challenge to the legal sufficiency of the evidence, the court must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. ***Jackson v. Virginia***, 443

U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational factfinder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *Id*. Due process requires the State to prove every element of the crime charged. *Cada v. State*, 334 S.W.3d 776, 772-3 (Tex. Crim. App. 2011). The "elements of the offense" are the elements the State is required to plead and prove, measured by the specific elements that the State has alleged in the indictment. *Id*.

Arguments and Authorities

In the case at bar, the State was required to prove that Ana Maria Gonzalez-Angulo unlawfully, intentionally and knowingly caused serious bodily injury to a person with whom she had a dating relationship by poisoning the complainant with ethylene glycol or by causing the complainant to ingest ethylene glycol. The evidence at trial was wholly insufficient to establish that the complainant and Ana Maria Gonzalez-Angulo were in a "dating relationship," and, in fact, conclusively established that they were not. Appellant addresses this issue in Appellant's Third Point of Error, below, and incorporates by reference all arguments and authorities in that point of error here. Because the State requested and obtained an

33

instruction on the lesser-included offense of aggravated assault, however, appellant is dedicating this second point of error to the elements of that offense.

The State presented legally sufficient evidence that the complainant sustained serious bodily injury, as well as legally sufficient evidence that the injury was caused by ethylene glycol, in the sense that the succession of experts who believed he ingested ethylene glycol based on the differential diagnosis they performed meets the minimum standard of more than a "modicum" of evidence required under *Jackson*. *Jackson v. Virginia*, 443 U.S. at 314, 318 & n.11, 320, 99 S.Ct. at 2786, 2789 & n.11.; *see also*, *Garcia v. State*, 367 S.W.3d 683, 687 (Tex. Crim. App. 2012). The State failed to prove, however, that Ana Maria Gonzalez poisoned the complainant or caused him to ingest ethylene glycol.

It is undisputed that the State lacked any direct evidence linking Ana Maria Gonzalez to the complainant's injuries and, in fact, any direct evidence suggesting he was poisoned at all. The State's case rested entirely on circumstantial evidence and never excluded the possibility of ingestion by accident or out of a desire for self-harm. A conviction can be based on circumstantial evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In fact, circumstantial evidence may be as probative as direct

evidence and circumstantial evidence alone can be sufficient to establish a defendant's guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Nevertheless, the cumulative effect of all incriminating facts must be sufficient to support the conviction. *Id*. If the evidence presented at trial raises "only a suspicion of guilt, even a strong one, then that evidence is insufficient to convict." *Richard Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010).

The State's evidence rested on the complainant's after-the-fact insistence that the coffee Ana Maria Gonzalez gave him on the morning of his hospitalization must have contained ethylene glycol (R.R.10 60-62, 10 – 65, 67, R.R.9 – 258-259). At the time of his injury, however, the complainant told investigators and physicians that Ana Maria Gonzalez drank the same coffee from the same cup he did throughout the day (R.R.10 – 65-67). Furthermore, neither the complainant nor anyone else ever saw Ana Maria Gonzalez make any coffee or sweeten any coffee (R.R.9 – 251-252). The only cup he could logically deduce she made for him, the one at her own home, was the one he did not drink (R.R.9 – 251). He testified he had a couple of sips of the coffee (R.R.9 – 251). No ethylene glycol was found in her possession or in any coffee mugs or glasses they drank out of that day. The evidence conclusively showed every physician at M.D.

Anderson had as much access to ethylene glycol as she did. At most, the complainant's speculation about the coffee amounts to a suspicion or guess regarding Ana Maria Gonzalez' opportunity to poison him with ethylene glycol, based almost entirely on the best guesses of his treating physicians about the most likely window of ingestion. The evidence at trial showed that the window of possible ingestion realistically extended as far back as the previous Friday night, although some experts maintained that the most likely time would have been during the day on Sunday, January 27.

Motive and opportunity may be circumstances indicative of guilt. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Evidence of motive or opportunity may help link a defendant to wrongful conduct or it may be supportive of other evidence of such conduct. *Hacker v. State*, 389 S.W.3d 860 870-871 (Tex. Crim. App. 2013). But without evidence that wrongful conduct occurred, there is nothing for motive and opportunity evidence to link the defendant to. *Id*. The complainant's conclusion that Ana Maria Gonzalez poisoned him based purely on her opportunity to do so does not rise to the level of sufficient evidence. The complainant and Ana Maria Gonzalez were not even alone at M.D. Anderson during the day on Sunday when the complainant and the State suggest he was poisoned. Plenty of evidence shows that the complainant spoke to other co-workers and

colleagues and that the complainant and Ana Maria Gonzalez wandered in and out of other people's offices throughout the day (R.R.9 – 267, Testimony of Wendi Stone, Bonnie Glisson, Frank Fosella).

With regard to motive, the State attempted to demonstrate a motive for Ana Maria Gonzalez to harm the complainant. Most of the circumstances developed at trial contradicted this theory, and, as shown in the Appellant's Second Point of Error, above, the "fatal attraction" motif was a fabrication of the State that was contradicted by other witnesses who showed him to be a serial womanizer who preyed upon female doctors with whom he came into contact. Yet those witnesses were prohibited from testifying or unavailable at trial. The motive assigned by the State made no logical sense when considered in light of the evidence developed at trial.

For example, the State suggested that Ana Maria Gonzalez was so jealous of Evette Toney that she decided to harm the complainant. This has no logical force and is hard to square with a lovelorn woman set on winning the complainant. Such a suggestion might have made sense if Evette Toney had been the one injured, but given that the complainant and Ana Maria Gonzalez were still talking regularly on the phone, working together on a daily basis, and occasionally engaging in casual sex, it does not follow that she would harm *him* out of jealously over Evette Toney. Furthermore,

witnesses throughout trial, even witnesses called by the State, consistently acknowledged Ana Maria Gonzalez' dedication to her patients and her work and her excellence as a physician. The evidence showed she had an important business meeting on the night of the complainant's hospitalization, which she attended with the complainant (R.R.5. 180-185). The evidence also showed that Ana Maria Gonzalez was at least familiar in a rudimentary way with the effects of ethylene glycol poisoning (R.R.5 – 294). It is not a reasonable inference from the evidence to suppose she would poison her research partner with an intoxicating toxin and then take him to dinner with two senior members of her faculty, both accomplished physicians, for a meeting she hoped would result in a new career opportunity. The evidence showed Ana Maria Gonzalez told several doctors she was concerned about the complainant, that she was worried and upset when he refused to go to the emergency room, and that she followed him and accompanied him to the emergency room herself.

The State also attempted to connect the mysterious events and strange behaviors from the previous months with the injury sustained by the complainant. For example, the State suggested that Ana Maria Gonzalez staged an attack on herself and sent an anonymous letter to Evette Toney, pretending to threaten herself and the complainant in an attempt to discredit

or frame Evette Toney. Even if the jury believed the State's interpretation of this evidence and thought Ana Maria Gonzalez faked an attack on herself out of jealousy, that fact does not support a reasonable deduction that she later tried to poison the complainant.

In some instances, the "staging" of a crime can be a circumstance supporting a logical inference of guilt. In *Temple v. State*, 290 S.W.3d 341 (Tex. Crim. App. 2013), the evidence showed that the murder scene was "staged" after the murder to make it look like a burglary. Likewise, in *Routier v. State*, 273 S.W.3d 241 (Tex. Crim. App. 2008), there was evidence supporting the staged nature of a crime, supporting an inference of guilt in a circumstantial case. In both those cases, however, the staging relied on by the courts concerned the charged offense itself. In the instant case, Ana Maria Gonzalez and the complainant were open and exposed throughout the day of his hospitalization, interacting with other physicians, discussing his health and the status of his symptoms as he began to seem ill, and participating in a group dinner together. Considering the evidence in the light most favorable to the verdict, as the standard of review requires, and assuming the jury believed Ana Maria Gonzalez staged an attack on herself more than two months before, such evidence does not support a logical

inference that she harmed the complainant with ethylene glycol on the date of his hospitalization.

This case is similar to ***Stobaugh v. State***, 421 S.W.3d 787 (Tex. App.—Forth Worth 2014, no pet.). In that case, the court of appeals reversed and acquitted the defendant of murder after he was convicted entirely on circumstantial evidence. The court pointed out that lies and inconsistent statements in the absence of proof of wrongful conduct did not support an inference of *mens rea* for murder. ***Stobaugh v. State***, 421 S.W.3d at 787. The defendant in that case behaved in an occasionally bizarre manner following the disappearance of his wife, but the court concluded that "the fact that he lied about calling Kathy or lied about hiring a private investigator with her money does not support a reasonable deduction that he possessed intent to kill her." ***Id***. The court continued, "just theorizing or guessing by the jury as to the meaning of his suspicious conduct is not a logical deduction from the conduct." ***Id***.

Likewise, in the instant case, the State encouraged the jury to theorize or guess as to the meaning of some conduct it labeled as suspicious both before and after the complainant's injury. Much of the State's case was based on doctors recounting things Ana Maria Gonzalez said in the days and months following the complainant's injury that they theorized might be

suspicious. None of those things rose to the level of establishing any actual connection between Ana Maria Gonzalez and the apparent ingestion of ethylene glycol, and none were inconsistent with a person concerned about a close friend or colleague, especially after she found herself the target of an investigation based purely on circumstances and her opportunity to commit a crime.

One of the most bizarre aspects of the State's case was the complainant's insistence, well after the fact, and at trial, that he noticed a sickeningly sweet taste in the coffee Ana Maria Gonzalez shared with him. He testified he found it almost unbearably disgusting, yet continued to drink it throughout the day out of politeness (R.R.9 – 258-259). Throughout much of the day of his injury the complainant was less than a few yards away from a coffee machine, where he could have presumably made all the coffee he wanted. It strains credibility to believe that he would drink something he found sickening, disgusting and perhaps even toxic because he did not want to hurt the feelings of someone he had been using for casual sex at the office over the previous two years. This testimony was matched by the equally bizarre testimony of Evette Toney that the complainant told her within a day or two that he suspected Ana Maria Gonzalez of poisoning him with the coffee but wanted her to "keep this just between ourselves," and "not poke

the dragon," leading her to lie to law enforcement and suggest "maybe it was some psycho waiter." (R.R.10 – 61-62, R.R.11 – 73-77, 205). In this regard, the arguably strange conduct of Ana Maria Gonzalez following the hospitalization of the complainant, relied upon by the State as "circumstantial evidence" of her guilt, was exceeded by the even stranger behavior of the complainant and his girlfriend, starting with her video recording of the complainant at the hospital and culminating in the secret taping of phone conversations they made over hours and hours of solicited conversations with Ana Maria Gonzalez (R.R.10 – 107-109).

It was not enough to show that the complainant ingested ethylene glycol and Ana Maria Gonzalez had the opportunity to give it to him, even when coupled with supposition, suspicions and curious conduct in the days following the complainant's injury. These circumstances do not rise to the level of sufficient evidence to establish the elements of aggravated assault, even in an entirely circumstantial case. The State's evidence was legally insufficient to support the conviction, and the case should be reversed and the appellant acquitted.

## APPELLANT'S THIRD POINT OF ERROR

> The State failed to establish Ana Maria Gonzalez-Angulo was "in a dating relationship" under the terms of the Family Code and the Penal Code and the evidence was insufficient to support the offense as pled in the indictment.

Ana Maria Gonzalez-Angulo was charged with aggravated assault on a "person with whom she had a dating relationship." Under the Penal Code, aggravated assault under section 22.02 is a second degree felony unless certain further aggravating circumstances apply, one of which is being in a dating relationship as described by the Family Code in section 71.0021(b). Under that provision, a "dating relationship" means a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature. Tex. Fam. Code Ann. sec 71.0021(b) (West 2014). The existence of such a relationship shall be determined based on consideration of: (1) the length of the relationship; (2) the nature of the relationship; and (3) the frequency and type of interaction between the person involved in the relationship. *Id*. When an aggravated assault is between two people with a "dating relationship," the offense is a first-degree felony with a significantly greater punishment range. A casual acquaintanceship or ordinary fraternization in a business or social context does not constitute a "dating relationship". Tex. Fam. Code Ann. sec 71.0021(c) (West 2014).

43

Courts of appeals in Texas have struggled with the broad definition of "dating relationship." As one justice explained, "I believe the legislature did not intend to include within the purview of section 22.01 all persons who had ever dated in their lifetime." *Sanchez v. State*, ---S.W.3d--- (Tex. App.—Eastland, 2015) (Wright, J., dissenting and concurring). In one recent case, the Court of Criminal Appeals agreed with the State that the defendant and the complainant were in a "dating relationship" when they spent the night at each other's residences and had dated about a month. *Villareal v. State*, 286 S.W.3d 321, 324 (Tex. Crim. App. 2009).

The evidence presented at trial established conclusively that the complainant did not consider himself to be in a dating relationship with Ana Maria Gonzalez (R.R.10 – 44, 129). He testified explicitly that he did not consider the relationship a romantic one, that he did not love her (R.R.10 – 48), and that it was not a dating relationship (R.R.10 – 44, 129). He further testified that the relationship was at least 95% work and only 5% casual sex (R.R.11 – 85-87). He explained that he withheld intercourse in the relationship specifically because he made a distinction between that kind of intimacy and the casual, meaningless sexual act of oral sex (R.R.9 - 167-168). He said that the incidences of sexual acts were perhaps as infrequent as once a month or less and that he was in a committed and loving relationship

with Evette Toney (R.R.9 – 167). Ana Maria Gonzalez was quoted by Evette Toney as saying, "it was just sex," referring to the physical aspect of her relationship with the complainant (R.R.11 – 83-86). The complainant and Ana Maria Gonzalez never lived together, never told anyone they were boyfriend and girlfriend, never went out on a date and did not engage in demonstrations of affection in the office. Ana Maria Gonzalez was quoted several times in the record as saying she loved the complainant "like a brother," (R.R.9 – 163, 170, R.R.5 – 129, R.R.7 – 175) and told one colleague he was "her best friend in the United States." (R.R.7 – 176).

Even more to the point, the provisions regarding aggravation of offenses in the context of a dating relationship are intended to protect individuals from domestic violence by punishing them more severely than other assaults. To hold Ana Maria Gonzalez accountable for injuries to the complainant within a "dating relationship" under the facts of this case violates the spirit of the law. Ana Maria Gonzalez told Evette Toney, "he used you and he used me." (R.R.11 – 86). The record shows that she helped the complainant in his career and his liaison with her resulted in promotions for him at work and an increased visibility for his research. (R.R.9 – 171-172, R.R.10 – 40-45, R.R.5 – 126). It shows that the complainant was senior to Ana Maria Gonzalez at M.D. Anderson and came from an influential and

successful family of physicians (R.R.9 – 145 – 149, 156). The complainant testified that when he had sexual relations with Ana Maria Gonzalez, those acts were confined to her giving him oral sex, but not the other way around (R.R.9 – 164-165). The complainant's supervisor called him into her office because his behavior around Ana Maria Gonzalez was, as she put it, "unseemly." (R.R.7 – 104). The complainant did not wish to risk his own medical license and career by writing a fake doctor's note for his common-law wife, Evette Toney, so he induced Ana Maria Gonzalez to write one for him (R.R.9 220 – 224). At trial, the complainant reluctantly conceded to "partial responsibility" for his common-law wife's loss of employment after she turned in the fake note he got from Ana Maria Gonzalez (R.R.9 – 223). One of the State's witnesses, Dr. Jennifer Litton, testified that she felt the relationship was unhealthy for Ana Maria Gonzalez and that she noticed throughout the fall that Ana Maria Gonzalez was losing weight, was more tearful than usual, frail, agitated and sad (R.R.12 – 56-57). These observations do not describe a relationship where Ana Maria Gonzalez was domineering or controlling of the complainant or where she was abusive or inclined toward domestic violence. To the contrary, the record shows the complainant remorselessly using a woman in a weaker position, a younger faculty member without the contacts and background he had in the Houston

46

area, to advance his own career while using her for his own sexual gratification and lying to his common-law wife (and anyone else who inquired about it).

In a transparent attempt to increase the punishment range and over-charge Ana Maria Gonzalez, the State attempted to characterize what amounted to sexual harassment by a senior M.D. Anderson staff member as a "dating relationship." The State failed to prove that the complainant and Ana Maria Gonzalez were in a dating relationship within the meaning of the Penal Code and the Family Code. Because the State requested and obtained an instruction on the lesser included offense of aggravated assault, the next step would be for this Court to consider the sufficiency of the evidence to support a conviction for aggravated assault, as argued in Point of Error Three. If this Court concludes that the evidence was legally sufficient to support the lesser-included offense, the proper remedy would be to reverse and reform the judgment to reflect a conviction for the lesser-included offense, and then remand for a new punishment hearing. *Bowen v. State*, 374 S.W.3d 427, 431-32 (Tex. Crim. App. 2012); *see also*, Tex. R. App. P. 43.2(d); *Thornton v. State*, 425 S.W.3d 289, 299-300 (Tex. Crim. App. 2014).

APPELLANT'S FOURTH POINT OF ERROR

> The trial court erred by allowing a State's witness to identify Ana Maria Gonzalez-Angulo's voice in a surreptitiously recorded telephone call based on two prior anonymous telephone conversations during which the State's witness never learned the identity of the person with whom he was talking.

Applicable Facts

During its case-in-chief, the State introduced the testimony of Mike DeSilva, a compliance investigator for GlaxoSmithKline (GSK). (R.R.10 – 184). The witness was presented as an expert of sorts, with about twenty-two years of law enforcement experience (R.R.10 – 184). DeSilva testified he was investigating complaints about the conduct of Evette Toney, a GlaxoSmithKline employee, through conversations with an anonymous informant at M.D. Anderson. The investigation began in early February because of an anonymous letter (R.R.10 – 190-193). In early March, an unknown individual called the compliance hotline to inquire about the status of the complaint (R.R.10 - 192). DeSilva testified that it was not uncommon for GSK to receive complaints from anonymous callers because people reporting conflicts of interest often do not want friends or colleagues to know they are reporting the conflict (R.R.10 – 240). Mike DeSilva told the hotline personnel to ask the individual to call him on his cell phone and on

April 30, 2013, he received a call from an individual entirely unknown to him. The call was short because it was evening and he was in the car with his son (R.R.10 – 195). The next day, however, on May 1, 2013, DeSilva had a conversation with the unknown person for approximately thirty minutes (R.R.10 – 195). He described the caller as female with a Hispanic accent (R.R.10 – 196).

Based on this thirty minute conversation with a person entirely unknown to him, described only as "female with a Hispanic accent," DeSilva was permitted to testify over defense objection that he recognized the voice as being the same one as in State's Exhibit 127, one of the secretly recorded phone calls the complainant made of Ana Maria Gonzalez. This testimony amounted to an in-court identification of Ana Maria Gonzalez as the anonymous person behind the complaints to GlaxoSmithKline.

Standard of Review

An in-court identification is inadmissible if tainted by an unduly suggestive pretrial identification. *Loserth v. State*, 963 S.W.2d 770, 772 (Tex. Crim. App. 1998). A pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process. *Barley v. State*, 906 S.W.2d 27, 32-33 (Tex. Crim. App. 1995). Appellate courts

review de novo the question of whether a pretrial identification procedure amounted to a denial of due process. *Gamboa v. State*, 296 S.W.3d 574, 581 (Tex. Crim. App. 2009). First, the court determines whether the pretrial identification procedure was impermissibly suggestive. *Id*. Second, if the court concludes the procedure was impermissibly suggestive, the court determines if the impermissibly suggestive nature of the pretrial identification gave rise to a substantial likelihood of irreparable misidentification. *Id*. For an identification based on an impermissibly suggestive procedure to be admissible, the totality of the circumstances must show no substantial likelihood of misidentification. *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999).

Arguments and Authorities

To set the stage for DeSilva's in-court identification of Ana Maria Gonzalez, the prosecutor asked, "have you had occasion to listen to known recordings of the defendant speaking?" (R.R.10 – 196). The court asked the prosecutor, "Voice identifications are admissible because why?" (R.R.10 – 197). The prosecutor was unable to come up with a basis for admission. Defense counsel objected on the basis of an impermissibly suggestive out-of-court identification procedure, because DeSilva listened to tapes of Ana Maria Gonzalez, and *only* Ana Maria Gonzalez, after she had already been

arrested, identified as the key suspect by Detective Sosa, and charged with aggravated assault (R.R.10 – 196).

Defense counsel rightly distinguished the ordinary authentication and identification procedure for voices prior to the admission of recorded calls. Rule 901(b) of the Texas Rules of Evidence provides for voice identification by a witness prior to the admission of an audio recording. Tex. R. Evid. 901(b). In those circumstances, the witness can identify a voice "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Tex. R. Evid. 901(b)(5). In the instant case, the State had no recordings of DeSilva's phone conversation with the anonymous caller and did not seek to admit any such evidence. Instead, the State hoped to use evidence of Ana Maria Gonzalez' voice, already admitted into evidence, as a vehicle for DeSilva to testify to an in-court identification in an attempt to establish her as the anonymous caller in the GSK complaints. This was, as defense counsel pointed out, the opposite of authenticating an audio recording for admission as contemplated by Rule 901(b). (R.R.10 – 198). The court agreed that the State was not seeking to authenticate an audio recording under Rule 901, stating, "Right, but that's not what this is." (R.R.10 – 198). It was an identification procedure similar to a photo lineup based on voice recognition. Voice exemplars are

sometimes used in place of photos to identify defendants in out-of-court procedures, but they require multiple suspects reading the words of an assailant so the witness has the opportunity to pick out the correct voice. *See, e.g., United States v. Wade*, 388 U.S. 218, 221-23, 87 S.Ct. 1926, 1929-30, 18 L.Ed.2d 1149 (1967).

It is impermissibly suggestive to show a witness a single photograph, inform the witness that the suspect in the photograph has already been arrested for the crime, and ask the witness to identify the suspect. *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Madden v. State*, 799 S.W.3d 683, 694-95 (Tex. Crim. App. 1990). This is true even when the suspect has not yet been identified or arrested as the likely perpetrator. *Id*. Likewise, in the instant case, it was impermissibly suggestive to ask DeSilva to identify Ana Maria Gonzalez' voice as the anonymous caller by asking him to listen to a recording of her voice without providing exemplars of other female voices with Hispanic accents for comparison purposes. In addition, by the time DeSilva heard Ana Maria Gonzalez' voice on the recording with the complainant, she had already been arrested and charged with the underlying offense. Moreover, DeSilva knew Ana Maria Gonzalez had been arrested and charged with a crime

because Evette Toney notified him during an interview in July 2013 (R.R.10 – 237).

With visual identification, on-the-scene confrontations, also referred to as show-up identifications, have some degree of suggestiveness but may be acceptable, particularly when the viewing occurs immediately after the commission of the offense while the witness' memory is still fresh and accurate. *Garza v. State*, 633 S.W.2d 508, 512 (Tex. Crim. App. [Panel Op.] 1981). Thus, law enforcement may occasionally ask a single suspect or a procession of suspects to parade in front of a witness to a crime, one at a time, if circumstances support a finding that the procedure is not suggestive. *Id*. In the case at bar, however, DeSilva testified he spoke to the anonymous caller at the end of April and the beginning of May, 2013, for a total of about forty minutes over two calls, and then heard a recording of Ana Maria Gonzalez' voice for the first time in September 2014 (R.R.10 – 243). Nearly eighteen months had elapsed between his brief exposure to the voice of an anonymous caller over his cell phone and his opportunity to hear the identified voice of Ana Maria Gonzalez prior to trial. DeSilva was informed that the voices on the recording belonged to the complainant and Ana Maria Gonzalez (R.R.10 – 244). He affirmed on cross-examination that he already knew Ana Maria Gonzalez had been charged with a crime and that he had

discussed the case with Detective Sosa (R.R.10 – 244). Although he admitted he was not an expert in voice identification and had never been trained in recognizing voices, and he admitted discussing the case at length with Detective Sosa before listening to the recording of Ana Maria Gonzalez' voice, he insisted that in his opinion, the anonymous caller from the previous year was Ana Maria Gonzalez. He said, "the pitch sounded the same, the cadence, the accent, it sounded like the same person I spoke with on the phone on those two occasions, yes." (R.R.10 – 247).

The Due Process Clause of the Fourteenth Amendment of the United States Constitution protects an accused from the admission of a pretrial identification into evidence if it is "so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law." *Barley v. State*, 906 S.W.2d 27, 32-33 (Tex. Crim. App. 1995). The accused has to show (1) the pretrial identification procedure was impermissibly suggestive; and (2) it created a substantial likelihood of irreparable misidentification." *Sierra v. State*, 266 S.W.3d 72, 75 (Tex. App.—Houston [1st Dist.] 2008, pet ref'd). The second prong of the test is based on an evaluation of the following factors: (1) the witness' opportunity to view the perpetrator at the time of the offense; (2) the witness' degree of attention during the offense; (3) the accuracy of the

witness' prior description of the perpetrator; (4) the witness' level of certainty regarding identification at the time of confrontation; (5) the lapse of time between the offense and the subsequent confrontation. *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). In the instant case, these factors should be evaluated based on what DeSilva heard rather than saw, and instead of an offense, his comparison would be to the anonymous call reporting the conflict of interest to GSK.

DeSilva had two short, long-distance telephone calls on a cell phone with an anonymous informant. He was following up on a routine lead as part of his job as a compliance investigator. Unlike many witness identification situations, these circumstances did not involve a compelling or startling moment or a traumatic event for DeSilva. In terms of his accuracy in describing the anonymous caller, DeSilva could only ever say it was a "female with a Hispanic accent." DeSilva insisted at trial that the voices were the same, but also admitted to a long career in law enforcement and a lengthy interview with Detective Sosa during which Sosa shared his feelings about the case and about Ana Maria Gonzalez. Finally, with respect to the last factor, a substantial amount of time elapsed between the evenings when he heard the anonymous caller's voice and the day he was asked to listen to a recording of Ana Maria Gonzalez.

An analysis of the so-called *Biggers* factors leads inevitably to a finding that there was a substantial likelihood of irreparable misdentification. When a witness identifies a defendant based on an impermissibly suggestive pretrial procedure, the case will be reversed when there is a substantial doubt raised about the reliability of the identification. *Dispensa v. Lynaugh*, 847 F.2d 211, 221 (5th Cir. 1988) (out-of-court identification was inadmissible and the in-court identification could not stand without it). The trial judge asked the lawyers at the bench "why can't you just cross-examine on this?" The answer is that any time a witness becomes certain about his or her identification of a suspect because of an impermissibly suggestive pretrial procedure, the State has created a certainty in the witness' mind out of whole cloth. *See id*.

In the instant case, the State was never able to establish a connection between the injuries sustained by the complainant and Ana Maria Gonzalez. DeSilva's testimony, however, provided one attempt at a link that knitted the State's circumstantial case together in terms of identification. DeSilva's testimony sought to establish that the anonymous caller was the same person who set up the Conflict Report email account. In addition, his testimony strongly suggested that the anonymous caller was the author of the anonymous letters that precipitated GSK's investigation into Evette Toney's

behavior. The prosecutor used this evidence to try to establish a link between the anonymous letter the complainant testified he received during Thanksgiving 2012. The complainant testified the anonymous letter contained specific misspellings of the names of the people involved. DeSilva identified the same misspellings in the letter GSK received. Significantly, the jury never saw the letter the complainant claimed he received. Likewise, the jury did not have an opportunity to hear a recording of DeSilva's conversation with the unknown caller and compare the voice to the voice of Ana Maria Gonzalez themselves.

The State's case hinged on a theory of "fatal attraction," and part of that theory required proving that Ana Maria Gonzalez staged an attack on herself and sent anonymous letters and emails to the complainant and GSK in an effort to harass or entrap or otherwise harm the complainant and Evette Toney. The State's proof fell short of connecting Ana Maria Gonzalez with these events and DeSilva's identification testimony, tainted by Detective Sosa's view of the case, was an attempt to shore up this connection. His testimony was a violation of Ana Maria Gonzalez' rights to due process under the United States Constitution and under the similar due process provision of the Texas Constitution, and the trial court erred in admitting it.

Even if this Court analyzes the admission of DeSilva's testimony under the rules of evidence rather than considering it under the law applicable to pretrial and in-court identifications, the trial court still erred in admitting the evidence. Defense counsel also objected to the admission of the testimony under Rule 403, arguing that its probative value was outweighed by the danger of unfair prejudice. A trial court should exclude otherwise admissible evidence under Rule 403 if the probative value of such evidence is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. When an appellant challenges a trial court's ruling under the rules of evidence, the appellate court reviews the decision under an abuse of discretion standard. *See **Billodeau v. State***, 277 S.W.3d 34, 39 (Tex. Crim. App. 2009). To evaluate the admission of evidence under Rule 403, the court balances a variety of factors including: (1) whether the evidence had significant probative value; (2) whether the State had a compelling need for the evidence; (3) whether the evidence tended to suggest the jury make a decision on an improper basis; (4) any tendency of the evidence to confuse or distract the jury from the main issues; (5) the possibility that the jury might give undue weight to the evidence; and (6) the likelihood that presentation of the evidence would consume an inordinate amount of time or

repeat evidence already admitted. *Giglioblanco v. State*, 201 S.W.3d 637, 641-42 (Tex. Crim. App. 2006).

In the instant case, the investigator's testimony about an anonymous caller to GSK reporting a real and valid conflict of interest did not have significant probative value with respect to the key issues at bar. The conflict of interest with GSK and the loss of Evette Toney's job as a result of her own dishonesty were side issues in the case used by the prosecutor to suggest animosity toward Evette Toney and establish a motive for Ana Maria Gonzalez to hurt either her or the complainant. Motive is not an element of aggravated assault. For the same reason, the second factor argues against the admission of the evidence. The State only had a compelling need for this evidence because its direct evidence, and even its circumstantial evidence on the elements of the offense, was weak and inconsistent. The State used DeSilva's testimony to hint at its theory of the case, carried throughout the trial and into closing argument in place of actual evidence: that Ana Maria Gonzalez had a "fatal attraction" and attempted to frame Evette Toney for something she did not do. The third factor also militates against the admission of the evidence, because the purpose of DeSilva's testimony was to influence the jury to make a decision based on vague suppositions and innuendo about Ana Maria Gonzalez' character and

perhaps even her emotional stability, rather than on the evidence presented on each of the elements of the offense. The fourth factor requires the court to consider whether the evidence has a tendency to distract the jury from the issues or confuse the issues. As stated above, the State's intent was to distract the jury from the paucity of evidence connecting Ana Maria Gonzalez to the actual offense at issue, and instead focus them on a series of confusing and unrelated incidents, many of which took place long after the complainant was injured.

Finally, while the evidence did not take a substantial amount of time, there was nevertheless a legitimate concern that the jury would place undue weight on it. The State spent a lot of time in its case-in-chief trying to suggest that Ana Maria Gonzalez was lying about phone calls she received, faking an attack and authoring anonymous letters. Despite the repeated emphasis on these allegations, little or no evidence was ever produced showing that she did, in fact, lie about any phone calls, fake an attack or author any anonymous letters. The State relied on DeSilva's testimony to establish a crucial link in its evidence that otherwise simply was not there.

The admission of this false identification testimony was distracting and confusing for another reason: even if the State had sufficient evidence to prove Ana Maria Gonzalez authored anonymous letters or faked an attack on

herself, none of these events would tend to prove or disprove any of the elements of the offense. The effect of this evidence and other evidence like it was to focus the jury on the theory the State was trying to put forward about the relationship between the complainant and Ana Maria Gonzalez rather than the elements of the charged offense.

The trial court erred in admitting the in-court identification made by DeSilva based on voice recognition and the admission denied Ana Maria Gonzalez her rights to due process and harmed her under the harmless error rule of the Texas Rules of Appellate Procedure. *See* Tex. R. App. P. 44.2. The case should be reversed and remanded for a new trial.

## PRAYER

Appellant respectfully prays this Honorable Court to reverse the conviction and acquit the appellant on the basis of insufficient evidence. Alternatively, appellant prays this Honorable Court to reverse and remand for a new trial.

Respectfully submitted,


/s/ Barbara Drumheller

Barbara A. Drumheller
8501 Katy Fwy, Ste 201
Houston, Texas  77024
713-504-4492
Texas Bar No. 00793643

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing instrument has been served on the Harris County District Attorney's Office as required by the Texas Rules of Appellate Procedure.

/s/ Barbara Drumheller

Barbara A. Drumheller
8501 Katy Fwy, Ste 201
Houston, Texas  77024
713-504-4492
Texas Bar No. 00793643

## CERTIFICATE OF COMPLIANCE

This is to certify that the foregoing computer-generated brief has no more than 12,726 words in compliance with Rule 9 of the Texas Rules of Appellate Procedure.

/s/ Barbara Drumheller

Barbara A. Drumheller
8501 Katy Fwy, Ste 201
Houston, Texas 77024
713-504-4492
Texas Bar No. 00793643